Harold S. Denniston v. Commissioner.
Harold S. Denniston v. Commissioner
Docket No. 4611.
United States Tax Court
1945 Tax Ct. Memo LEXIS 58; 4 T.C.M. (CCH) 965; T.C.M. (RIA) 45325; October 18, 1945
*58 Scott Crampton, Esq., for the petitioner. S. Earl Heilman, Esq., for the respondent. HILL Memorandum Opinion HILL, Judge: The Commissioner determined deficiencies in income tax for the calendar years 1940 and 1941 in the amounts of $26.76 and $3,742.43, respectively. The issues are whether petitioner sustained a long-term capital loss on the sale of stock in 1941 and whether two debts became worthless either in that year or in 1940. [The Facts] Harold S. Denniston, the petitioner, is an individual residing at Mobile, Alabama. He is engaged in the banking business and has been president of the American National Bank & Trust Company of Mobile since 1932. He keeps his books and files his Federal income tax returns on the cash receipts and disbursements basis. The returns for the period here involved were filed with the collector for the district of Alabama. On brief the parties agree that the petitioner realized a long-term capital gain of $683.46, taxable at 66 2/3 percent, on the sale of his Joachim Street property. At the hearing the parties removed a second issue by stipulating as follows: "Petitioner owned 120 shares of stock in the H. H. Patterson *59 Oil Company; he had acquired the stock in the years 1935 and 1936 at a cost of $16,180.01; he had recovered part of the cost by means of receipt of nontaxable distributions to the extent of $5,880.41, and had a remaining unrecovered cost as of the time of the liquidation of the company in 1941 of $10,299.60. From that liquidation he received property having a fair market value of $11,843.08, realizing a long-term capital gain of $1,543.48." Issue 1 [The Facts] In August 1938 the Beechwood Band Mill Company (hereinafter referred to as Beechwood) was organized for the purpose of purchasing standing timber and converting it into lumber. There were issued 340 shares of common stock of which petitioner acquired 120 shares for $12.000. Petitioner became Beechwood's president. Throughout the period of its operations Beechwood sustained losses and petitioner loaned it considerable amounts of money taking as security a mortgage on its mill, timber and lumber. It was insolvent and ceased to do business about the end of 1938 or the beginning of 1939. All debts of the company, except for a portion of the loan made to it by petitioner, were paid in 1939. In that year petitioner foreclosed *60 the mortgage he held as security on the corporate property and after applying the proceeds of the sale thereof to his loan there remained a debt due him of $34,323.97. In their joint income tax return for 1939, petitioner and his wife reported this as a bad debt. The Commissioner has never questioned this deduction. Neither petitioner nor his wife reported any short-term capital gains in 1939. At the end of 1939 the only assets of Beechwood were two negotiable demand notes executed under seal in the amounts of $4,126.09 and $3,925.52, payable to Beechwood and signed by P. F. Fitzgibbons and J. G. Fitzgibbons, respectively. The makers of these notes were both employed during 1940 and 1941. Each note was secured by the 50 shares of Beechwood stock which the maker owned and each was accompanied by a stock transfer power of attorney signed by the respective stock owners. Petitioner, as the president of Beechwood, held these notes and the stock transfer powers for the company during 1940 and 1941. On December 30, 1941, petitioner sold and delivered his 120 shares of Beechwood stock to B. H. Pake for $114. Pake and his concern were engaged in the business of buying assets of corporations *61 in distress. As part of the consideration for the purchase price petitioner agreed that he would never press his claim of $34,323.97 against Beechwood. Petitioner also delivered the two Fitzgibbons' notes and the accompanying powers of attorney to Pake. Absent the petitioner's agreement never to press his claim against Beechwood, Pake would have paid nothing for the 120 shares. In 1939 the stock had no current liquidating value and no value through foreseeable operations of the business. It is petitioner's contention that he sustained a long-term capital loss on the sale of this stock for $114 in 1941. Respondent's position is that the stock became worthless prior thereto in 1939 when Beechwood ceased operations and petitioner foreclosed his mortgage on its mill, timber and lumber. We hold that the stock became worthless not later than 1939. This case is unlike . The taxpayers there were the owners of all the preferred shares and a substantial amount of the common shares of the corporation. In order to present an improved financial statement and to continue the business in 1921 they cancelled the indebtedness owing to them by *62 the corporation. The corporation continued to operate until 1927 albeit with annual losses. The court there said: * * * The discharge of indebtedness in the amount of $293,970 had operated to give the stock a book value substantially equal to its par value. The company's credit position was greatly improved. * * * There still remained the hope, and possibly the expectation, [in 1921] that the affairs of the corporation could be made to prosper. In no sense could the transaction be considered as closed while operations thus actively continued. * * * The court affirmed the Board's decision that the stock was not worthless in 1921 when the debt to the stockholders was cancelled and deduction allowed as a bad debt. Here, on the other hand, the agreement not to press the debt was not an attempt to help the company at all. The company ceased business and lost its plant and operating assets in 1939. The debt was not cancelled in 1939 and the agreement not to press it in 1941 was motivated by no desire to aid the company. When the insolvent company ceased operations in 1939, lost its mill, timber and lumber, and the petitioner charged off its indebtedness to himself as worthless, he *63 could not reasonably maintain that its stock was then of any value. He argues "if the year 1939 were before the Court and petitioner was claiming a loss on his Beechwood stock in 1939 it is apparent that the 1941 sale would deprive petitioner of any such deduction in 1939." The fallacy in this reasoning is that the sole value of the stock in 1941 arose from the contemporaneous agreement by petitioner never to assert his claim for the debt owed to him by the company. This is clear from the answers on cross-interrogatories of B. H. Pake, the purchaser of the shares: 27. * * * If Mr. Denniston had not agreed never to assert his claim for the debt owed him by the Beechwood Band Mill Company, how much would you have paid for the 120 shares of stock which he sold you? Nothing. 28. Would you have paid anything for it, in the absence of that agreement? No. 29. Is it not true that practically the entire value to you or the Assets Realization Co., Inc. of the stock purchased from Mr. Denniston was his contemporary agreement not to assert his claim against that company? Yes. 30. What would you consider a reasonable value for that stock if it were unaccompanied by that contemporary *64 agreement of Mr. Denniston? Nothing. Inasmuch as petitioner was not the sole stockholder, it is obvious that Pake would have paid him somewhat more for an outright transfer of the debt due him from Beechwood than for his shares plus his agreement never to seek payment. The transaction with Pake was a subterfuge to lend an appearance of value to the shares in 1941. While it is unfortunate that petitioner had no short-term capital gains in 1939 against which to offset this short-term loss, the loss is deductible when sustained. The petitioner reported a short-term capital gain of $302.41 in 1940. Under the provisions of section 117 (e) of the Revenue Act of 1938, permitting a one year carry-over of short-term losses, the Commissioner has given him the benefit of the loss on the Beechwood Band Mill Company stock to that extent for 1940. Issue 2 [The Facts] In 1938 petitioner took an unsecured note for & 300 Sterling from E. @E. W. Bolloten in satisfaction of a somewhat larger note formerly owing to petitioner from Mrs. Bolloten. Beginning in 1913, and for six years thereafter, petitioner had been closely associated with Bolloten, a Welshman, in the export-import and baking *65 business in Bolivia. Bolloten had petitioner's full confidence, was thoroughly trustworthy, and had full charge of petitioner's affairs in his absence. When Bolloten came to the United States in about 1922 he had made more than $100,000. The original debt in question arose when petitioner made a loan to Bolloten's wife taking as security a mortgage on her house at Great Neck, Long Island. The Bollotens went back to live in England. Petitioner released the mortgage when the Bollotens got an opportunity to sell the house. Later, petitioner forwarded Mrs. Bolloten's note to Barclays Bank in London for payment. The report came back that the Bollotens were unable to pay but as a result of negotiation through Barclays Bank, petitioner accepted a note for [*] 300 Sterling from Bolloten in satisfaction of Mrs. Bolloten's note. From October 13, 1938 through July 24, 1939, Bolloten made payments totaling $273.47 which reduced the principal of the note to $1,030.39. Bolloten never returned to the United States after giving petitioner the note. All payments on the note ceased when England went to war in September 1939 and Bolloten lost his neon sign business. Petitioner made several unsuccessful *66 attempts to collect on the note, the matters being handled in England by attorneys selected for him by Barclays Bank, but no suit was instituted. On October 9, 1940, Bolloten wrote Barclays Bank in part as follows: "* * * I have no fixed address at the moment as am travelling this district for a paint firm. * * *
"I regret I can do nothing at the moment in regard to the Denniston matter. Due to the war I have also closed my business and my present means do not permit me to effect any payments. "I can only suggest that the matter be left in abeyance for the duration after which providing one is still alive to be able to resume business and clear my obligation." Petitioner's reply to Barclay's Bank was "to leave the Bolloten matter in abeyance for another six months until we see what develops." On December 22, 1941, petitioner wrote the representative of Barclays Bank, "I am perfectly satisfied to wait for Bolloten to resume his payments whenever he gets back in business or gets a job which will enable him to do so but I feel that whenever he is able to pay he should be made to do so." It became apparent in 1941 that Bolloten was unable to pay his note. Through Barclays *67 Bank and his attorneys petitioner had received advice not to press his debtor. Petitioner finally realized in 1941 that it was hopeless for him to expect Bolloten to make any payment. He ascertained the debt to be worthless and charged it off on his books on December 31, 1941. While it is impossible in a case of this sort to say with exactitude when a debt becomes worthless, upon consideration of all the evidence, we are of the opinion that petitioner's note from Bolloten did become worthless in 1941. Issue 3 [The Facts] Fernando Stepan, a Czech, had been associated with the petitioner in the banking and mining business in Bolivia during the 1920's. Petitioner considered him his "right hand man" and gave him full powers of attorney. While in the United States in 1928 Stepan borrowed $3,070.65 from petitioner on his demand note. Stepan was experienced in the mining of gold and tin and by 1926 had earned and accumulated about $125,000. He had made one payment of $827.72 on the note some years before 1941. No other payment has been made. On the occasions when petitioner has written him Stepan has professed inability to pay. In August 1937 Stepan wrote petitioner that he would *68 pay the note if he could sell his placer gold mine located in Bolivia. In 1941 petitioner was told by a man whom he met in Mexico, who had come from Bolivia, that Stepan's mine had proved to be unsuccessful. Petitioner knew of no other assets belonging to Stepan. During 1940 and 1941 petitioner unsuccessfully attempted to withdraw from Bolivia $800 or $900 personal funds which he had there. In 1941 petitioner was advised through banking channels that due to governmental policy in Bolivia it was impossible to withdraw funds from that country except for current purchases. Petitioner states that he ascertained the Stepan note to be worthless and charged it off on December 30, 1941, the main reason being that he knew it would be impossible to transfer any funds out of Bolivia whether Stepan was in a position to pay or not. Stepan, if able to pay, would have to make payment in bolivianos which petitioner could invest only in Bolivia. Petitioner did not hear from Stepan in regard to the note after 1941. Petitioner had an attorney in Bolivia but never requested him to take action to collect the money. The attorney notified him that Stepan died toward the end of 1943. Petitioner received *69 a letter from Stepan's daughter in 1944 notifying him of her father's death and asking what she should do with the powers of attorney which she had found among his papers. It is petitioner's contention that the Stepan note became worthless in 1941 or in 1940. His main reason for ascertaining the debt to be worthless in 1941 was that at the time he could not withdraw funds from Bolivia even if Stepan could pay. The temporary condition existing, albeit of indefinite duration, by which funds could not be withdrawn from Bolivia because of governmental policy but which did not prevent the collection of payment in the currency of that country does not justify a determination that the debt was worthless in the absence of any investigation as to the debtor's solvency. . Although petitioner had a lawyer in Bolivia there was no evidence that he even requested the lawyer to ascertain what property Stepan had or to verify the story he had heard from a chance acquaintance that Stepan's mine was unsuccessful. There is no evidence in the record to justify a determination that the debt became worthless either in 1940 or 1941. Decision will be *70 entered under Rule 50.